## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **MATEO GOMEZ** and **LYNETTE ARMSTRONG,** *individually and on behalf of all others similarly situated,*<br><br>Plaintiffs,<br><br>v.<br><br>**TANDYM GROUP, LLC,**<br><br>Defendant. | Case No.: 1:24-cv-03072-JPO<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Mateo Gomez and Lynette Armstrong ("Plaintiffs") bring this Consolidated Amended Class Action Complaint on behalf of themselves, and all others similarly situated, against Defendant, Tandym Group, LLC, ("Defendant"), alleging as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to them, which are based on personal knowledge:

### NATURE OF THE ACTION

1.    This class action arises out of Defendant's failures to implement reasonable and industry standard data security practices to properly secure, safeguard, and adequately destroy Plaintiffs' and Class Members' sensitive personal identifiable information that it had acquired and stored for its business purposes.

2.    Defendant's data security failures allowed a targeted cyberattack to compromise Defendant's network (the "Data Breach") that, upon information and belief, contained personally identifiable information ("PII" or "Private Information") of Plaintiffs and other individuals ("the Class"), including names and social security numbers. The Data Breach occurred on or around May 18, 2023. Defendant became aware of the attack on its system on May 30, 2023. Defendant

began sending notice letters to Class members on April 5, 2024.[1]

3.      Importantly, this is the second major data breach that Defendant has reported in the last few years. In February of 2021, Defendant provided notice of a different data breach involving individuals' names, addresses, Social Security numbers, driver's license numbers, state identification card numbers and/or government-issued identification numbers, financial account information, passport numbers, dates of birth, medical information, and health insurance information.[2]

4.      The potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendant, especially given the previously reported data breach, and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

5.      Defendant is an employee staffing company that has partnered with more than 35,000 companies.[3]

6.      According to the Notice of Security Incident letter that Defendant sent to Plaintiffs and Class Members (the "Notice Letter"), Defendant admits an unauthorized individual unlawfully accessed an employee Microsoft Outlook account and the iSolved system.[4]

7.      The Private Information compromised in the Data Breach included personal identifiable information of individuals whose Private Information was maintained by Defendant, including Plaintiffs.

---

[1] *See* Exhibit A, Notice Letter addressed to Plaintiff Armstrong; Exhibit B, Notice Letter addressed to Plaintiff Gomez.

[2] *See* https://tandymgroup.com/website-notice/ (last visited 8/5/2024).

[3] *See* https://tandymgroup.com/about// (last visited 8/5/2024).

[4] *See* Exs. A, B.

8.      Upon information and belief, a wide variety of PII was implicated in the breach, including, names and Social Security numbers.

9.      The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect individuals' Private Information with which it was under numerous duties to protect.

10.     Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure Private Information from those risks left that property in a dangerous condition.

11.     Upon information and belief, Defendant breached its duties and obligations by failing, in one or more of the following ways: (1) failing to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (2) failing to design, implement, and maintain reasonable data retention policies; (3) failing to adequately train staff on data security; (4) failing to comply with industry-standard data security practices; (5) failing to warn Plaintiffs and Class Members of Defendant's inadequate data security practices; (6) failing to encrypt or adequately encrypt the Private Information; (7) failing to recognize or detect that its network had been compromised and accessed in a timely manner to mitigate the harm; (8) failing to utilize widely available software able to detect and prevent this type of attack, and  (9) otherwise failing to secure the hardware using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

12.     Defendant disregarded the rights of Plaintiffs and Class Members (defined below) by, *inter alia*, intentionally, willfully, recklessly, and/or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions;

failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiffs' and Class Members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiffs and Class Members with prompt and full notice of the Data Breach.

13.    In addition, Defendant failed to properly maintain and monitor the computer network and systems that housed the Private Information. Had it properly monitored its property, it would have discovered the intrusion sooner rather than allowing cybercriminals a period of unimpeded access to the Private Information of Plaintiffs and Class Members.

14.    Plaintiffs' and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant collected and maintained is now in the hands of data thieves.

15.    As a result of the Data Breach, Plaintiffs and Class Members are now at a current, imminent, and ongoing risk of fraud and identity theft. Plaintiffs and Class Members must now and for years into the future closely monitor their financial accounts to guard against identity theft. As a result of Defendant's unreasonable and inadequate data security practices, Plaintiffs and Class Members have suffered numerous actual and concrete injuries and damages.

16.    The risk of identity theft is not speculative or hypothetical but is impending and has materialized as there is evidence that the Plaintiffs' and Class Members' Private Information was targeted, accessed, has been misused, and disseminated on the Dark Web.

17.    Plaintiffs and Class Members must now closely monitor their financial accounts to guard against future identity theft and fraud. Plaintiffs and Class Members have heeded such warnings to mitigate against the imminent risk of future identity theft and financial loss. Such mitigation efforts included and will continue to include in the future, among other things: (a)

reviewing financial statements; (b) changing passwords; and (c) signing up for credit and identity theft monitoring services. The loss of time and other mitigation costs are tied directly to guarding against the imminent risk of identity theft.

18.     Plaintiffs and Class Members have suffered numerous actual and concrete injuries as a direct result of the Data Breach, including: (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) financial costs incurred due to actual identity theft; (d) loss of time incurred due to actual identity theft; (g) deprivation of value of their PII; and (h) the continued risk to their sensitive Private Information, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect it collected and maintained.

19.     Through this Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed during the Data Breach.

20.     Accordingly, Plaintiffs bring this action against Defendant seeking redress for its unlawful conduct and asserting claims for: (i) negligence and negligence *per se*, (ii) breach of implied contract, (iii) unjust enrichment, and (iv) violation of the New Jersey Consumer Fraud Act.

21.     Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, as well as long-term and adequate credit monitoring services funded by Defendant, and declaratory relief.

22.    The exposure of one's Private Information to cybercriminals is a bell that cannot be un-rung. Before this Data Breach, Plaintiffs' and the Class's Private Information was exactly that—private. Not anymore. Now, their Private Information is forever exposed and unsecure.

## PARTIES

### *Plaintiff Mateo Gomez*

23.    Plaintiff Mateo Gomez is an adult individual who at all relevant times has been a citizen and resident of New Jersey.

24.    Plaintiff Gomez was a contractor employee with Defendant from around 2021 through 2023 and was placed in multiple positions based on his Human Resources skills.

25.    As a condition of contract employment, Plaintiff Gomez was required to provide Defendant, directly or indirectly, with his Private Information, including his name, Social Security number, and all other information that an employee would have to provide, including financial information and health information because he opted in for medical, dental and vision benefits through Defendant.

26.    Upon information and belief, at the time of the Data Breach, Defendant retained Plaintiff Gomez's Private Information in its system.

27.    Plaintiff Gomez is very careful about sharing his sensitive Private Information. Plaintiff stores any documents containing his Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

28.    Plaintiff Gomez received the Notice Letter, by U.S. mail, directly from Defendant, dated April 5, 2024, informing his that his Private Information was improperly accessed and

obtained by an unauthorized party during the Data Breach, including his name and Social Security number.

29.    Plaintiff Gomez is not aware of ever being part of a data breach involving his PII and is concerned that it and other private information has now been exposed to bad actors.  As a result, he has taken multiple steps to avoid identity theft, including changing passwords on all his accounts, considering signing up for credit monitoring services with notices and reports and carefully reviewing all his accounts.

30.    As a result of the Data Breach, Plaintiff Gomez made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach and reviewing account statements for any indications of actual or attempted identity theft or fraud. Plaintiff Gomez has already spent multiple hours dealing with the Data Breach, valuable time Plaintiff otherwise would have spent on other activities.

31.    Plaintiff Gomez suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of Private Information, a form of property that Defendant obtained from Plaintiff; (b) violation of privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

32.    As a result of the Data Breach, Plaintiff Gomez has recently experienced increased spam calls, texts and emails, which has resulted in a significant amount of lost time to him personally. He is specifically targeted in some of these spam communications.  He has been informed that his preferred usernames and passwords have been exposed and are vulnerable to fraudsters.

33.     Plaintiff Gomez anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

34.     Plaintiff Gomez greatly values his privacy, and would not have provided his Private Information, undertaken the contract employment if he had known that his Private Information would be maintained using inadequate data security systems.

***Plaintiff Lynette Armstrong***

35.     Plaintiff Lynette Armstrong, is, and at all times mentioned herein was, an individual citizen of Georgia and is a former employee of Defendant.

36.     As a condition of receiving employment with Tandym, Plaintiff Armstrong was required to provide her PII, directly or indirectly, to Defendant, including her name, date of birth, Social Security number, and other highly sensitive personal information.

37.     At the time of the Data Breach—in or around May, 2023—Defendant retained Plaintiff Armstrong's PII in its system.

38.     Plaintiff Armstrong is very careful about sharing her sensitive PII. Plaintiff stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted her PII to Defendant had she known of Defendant's lax data security policies.

39.     Plaintiff Armstrong received the Notice Letter, by U.S. mail, from Defendant, dated April 5, 2024. According to the Notice Letter, Plaintiff's PII was improperly accessed and obtained by unauthorized third parties, including her name and Social Security number.

40.    As a result of the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff Armstrong made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter, signing up for credit monitoring services, freezing her accounts. Plaintiff Armstrong has spent significant time dealing with the Data Breach—valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

41.    Plaintiff Armstrong suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

42.    After the Data Breach, Plaintiff Armstrong was notified of actual misuse of her PII in that a credit card was issued with a $15,000 limit to her name, which she did not authorize.

43.    The Data Breach has caused Plaintiff Armstrong to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

44.    As a result of the Data Breach, Plaintiff Armstrong anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

45.    As a result of the Data Breach, Plaintiff Armstrong is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come. Plaintiff Armstrong has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and the actual misuse resulting from her PII, especially her Social Security number, being placed in the hands of criminals.

46.    Because their personally identifying and financial information, including but not limited to their Social Security numbers, has been accessed by criminals, Plaintiff Armstrong and the Class have suffered concrete and ongoing injuries.

47.    According to experts, one out of four data breach notification recipients become a victim of identity fraud.

48.    Plaintiff Armstrong has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *Defendant Tandym Group, LLC*

49.    Defendant Tandym Group, LLC is a Delaware corporation with its principal place of business at 675 Third Avenue, 5th Floor, New York, NY 10017. Upon information and belief, Defendant's current and former contract employees and the victims of the Data Breach reside in multiple states, including New York.

### JURISDICTION AND VENUE

50.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members exceeds 100, some of whom have different

citizenship from Defendant, including Plaintiffs. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

51.     This Court has personal jurisdiction over Defendant because it is a limited liability company that operates and has its principal place of business in this District and conducts substantial business in this District.

52.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District. Moreover, Defendant is domiciled in this District, maintains Plaintiffs' and Class Members' Private Information in this District, and has caused harm to Plaintiffs and Class Members in this District.

## FACTUAL BACKGROUND

**A.    Defendant Knew the Risks of Storing Valuable PII and the Foreseeable Harm to Victims**

53.     At all relevant times, Defendant knew it was storing sensitive PII and that, as a result, Defendant's systems would be attractive targets for cybercriminals.

54.     Defendant also knew that any breach of its systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII was compromised.

55.     These risks are not merely theoretical; in recent years, numerous high-profile breaches have occurred at businesses such as Equifax, Yahoo, Marriott, Anthem, and many others.

56.     PII has considerable value and constitutes an enticing and well-known target to hackers.  Hackers easily can sell stolen data as a result of the "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[5]

---

[5] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/ (last visited 8/5/2024).

57.     The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. According to the ITRC, in 2019, there were 1,473 reported data breaches in the United States, exposing 164 million sensitive records and 705 million "non-sensitive" records.[6]

58.     In tandem with the increase in data breaches, the rate of identity theft and the resulting losses has also increased over the past few years. For instance, in 2018, 14.4 million people were victims of some form of identity fraud, and 3.3 million people suffered unrecouped losses from identity theft, nearly three times as many as in 2016. And these out-of-pocket losses more than doubled from 2016 to $1.7 billion in 2018.[7]

59.     The breadth and sensitivity of the data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Defendant's current and former contract employees especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

60.     According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data is sold or posted on the [Dark] Web,

---

[6] *Data Breach Reports: 2019 End of Year Report*, IDENTITY THEFT RESOURCE CENTER, at 2, *available at* https://notified.idtheftcenter.org/s/resource#annualReportSection.

[7] Insurance Information Institute, *Facts + Statistics: Identity theft and cybercrime*, available at https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20(1).

fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[8]

61.    Even if stolen PII does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

**B.    Defendant Breached its Duty to Protect Plaintiffs' and Class Members' PII**

62.    Defendant agreed to and undertook legal duties to maintain the personal information entrusted to it by Plaintiffs and Class Members safely, confidentially, and in compliance with all applicable laws, including the Federal Trade Commission Act ("FTCA"). Under state and federal law, businesses like Defendant have duties to protect its current and former employees' PII, including contract employees like the Plaintiffs, and to notify them about breaches.

63.    The Private Information held by Defendant in its computer system and network included the highly sensitive Private Information of Plaintiffs and Class Members.

64.    On May 30, 2023, Defendant became aware of a ransomware attack on its system.

---

[8] United States Government Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/assets/gao-07-737.pdf.

65.     The Data Breach occurred as a direct result of Defendant's failure to implement and follow basic security procedures, and its failure to follow its own policies, in order to protect Plaintiffs' and Class Member's PII.

66.     On April 5, 2024, Defendant sent the Notice Letter to Plaintiffs and Class Members about the attack on its server.[9]

**C.      Plaintiffs and Class Members Suffered Damages**

67.     For the reasons mentioned above, Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiffs and Class Members significant injuries and harm in several ways. Plaintiffs and Class Members must immediately devote time, energy, and money to: 1) closely monitor their statements, bills, records, and credit and financial accounts; 2) change login and password information on any sensitive account even more frequently than they already do; 3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and 4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

68.     Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiffs and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendant's conduct. Further, the value of Plaintiffs' and Class Members' PII has been diminished by its exposure in the Data Breach.

69.     As a result of Defendant's failures, Plaintiffs and Class Members are at substantial increased risk of suffering identity theft and fraud or misuse of Private Information.

---

[9] *See* Notice Letter, Exs. A, B.

70.     From a recent study, 28% of consumers affected by a data breach become victims of identity fraud – this is a significant increase from a 2012 study that found only 9.5% of those affected by a breach would be subject to identity fraud. Without a data breach, the likelihood of identify fraud is only about 3%.[10]

71.     Plaintiffs and the Class members have also been injured by Defendant's unauthorized disclosure of their confidential PII.

72.     Plaintiffs and Class Members are also at a continued risk because their information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect Plaintiffs and Class Member's Private Information.

## COMMON INJURIES AND DAMAGES

73.     As result of Defendant's ineffective and inadequate data security practices, Plaintiffs and Class Members now face a present and ongoing risk of fraud and identity theft.

74.     Due to the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including but not limited to: (a) invasion of privacy; (b) "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails;

---

[10] https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud.

(g) the loss of benefit of the bargain (price premium damages); (h) diminution of value of their Private Information; and (i) the continued risk to their Private Information, which remains in Defendant's possession, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information.

**A.    The Risk of Identity Theft to Plaintiffs and Class Members is Present and Ongoing**

75.    The link between data breaches and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

76.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity – or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

77.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or financial account information. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

78.    The dark web is an unindexed layer of the internet that requires special software or

authentication to access.[11] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[12] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

79.    A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal information like the PII at issue here.[13] The digital character of PII stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[14] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[15]

80.    Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to numerous serious fraudulent uses and are

---

[11]  *What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

[12]  *Id.*

[13]  *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

[14]  *Id.; What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

[15]  *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[16]

81.    What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

82.    Even then, new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[17]

83.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social

---

[16] Social Security Administration, *Identity Theft and Your Social Security Number*, available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.

[17] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[18]

84.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[19]

85.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[20] Defendant did not rapidly report to Plaintiffs and the Class that their Private Information had been stolen.

86.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

87.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

88.    Further complicating the issues faced by victims of identity theft, data thieves may

---

[18] *Identity Theft and Your Social Security Number*, Social Security Administration, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[19] *See* https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120.

[20] *Id.*

wait years before attempting to use the stolen PII. To protect themselves, Plaintiffs and Class Members must remain vigilant against unauthorized data use for years or even decades to come.

89.    The Federal Trade Commission ("FTC") has recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[21]

90.    The FTC has issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, effective data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.[22]

91.    The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.[23]

_____

[21] Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf.

[22] *See generally* https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

[23] *See, e.g.*, https://www.ftc.gov/news-events/news/press-releases/2016/07/commission-finds-labmd-liable-unfair-data-security-practices.

92.     Defendant's failure to properly notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs' and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

**B.     Loss of Time to Mitigate the Risk of Identify Theft and Fraud**

93.     As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

94.     Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover and detect.

95.     A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[24]

---

[24]    "Credit Card and ID Theft Statistics" by Jason Steele, 10/24/2017, at https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php.



96.    In the event that Plaintiffs and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[25] Indeed, the FTC recommends that identity theft victims take several steps and spend time to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[26]

---

[25] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf ("GAO Report").

[26] *See* https://www.identitytheft.gov/Steps.

**C.    Diminution of Value of the Private Information**

97.    PII is a valuable property right.[27] Its value is axiomatic, considering the value of "Big Data" in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

98.    Private Information can sell for as much as $363 per record according to the Infosec Institute.[28]

99.    An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[29] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[30, 31] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[32]

100.    As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized and potential release onto the Dark Web, where it may

---

[27] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[28]    *See*    https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

[29] https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[30] https://datacoup.com/.

[31] https://digi.me/what-is-digime/.

[32]    Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html.

soon be available and holds significant value for the threat actors.

**D.    Future Cost of Credit and Identify Theft Monitoring is Reasonable and Necessary**

101.    To date, Defendant has merely offered 12 months of complimentary "Single Bureau Credit Monitoring/Single Bureau Credit Report/Single Bureau Credit Score" services and "proactive fraud assistance" provided by "Cyberscout through Identity Force" to victims. Exs. A, B. Moreover, Defendant offered guidance on how to better protect against identity theft or fraud. *Id.* These half measures do not come close to adequately addressing the lifelong harm that victims will face following the Data Breach. Indeed, the breach involves PII that cannot be changed, such as Social Security numbers. Furthermore, these half measures are tacit admissions that its failure to protect their Private Information has caused Plaintiffs and the putative Class great injuries.[33]

102.    Defendant also places the burden squarely on Plaintiffs and Class Members by requiring them to expend time signing up for services, as opposed to automatically enrolling all victims of this Data Breach.

103.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes – e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

104.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file

---

[33] *See* Exs. A, B.

for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

105.    Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[34] The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

106.    Consequently, Plaintiffs and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

107.    The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

**E.    Injunctive Relief is Necessary to Protect Against Future Data Breaches**

108.    Moreover, Plaintiffs and Class Members have an interest in ensuring that Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online and that access to such data is password protected.

---

[34] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1.

109.    Because of Defendant's failure to prevent the Data Breach, Plaintiffs and Class members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses and lost time. Also, he suffered or are at an increased risk of suffering:

      a.    loss of the opportunity to control how their Private Information is used;

      b.    diminution in value of their Private Information;

      c.    compromise and continuing publication of their Private Information;

      d.    out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

      e.    lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

      f.    delay in receipt of tax refund monies;

      g.    unauthorized use of their stolen Private Information; and

      h.    continued risk to their Private Information —which remains in Defendant's possession—and is thus as risk for futures breaches so long as Defendant fails to take appropriate measures to protect the Private Information.

**G.    Lack of Compensation**

110.    Plaintiffs and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

111.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been placed at an actual, imminent, and substantial risk of harm from fraud and identity theft.

112.    Further, Plaintiffs and Class Members have been forced to expend time dealing with the effects of the Data Breach and face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

113.    Specifically, many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

    a.    Finding fraudulent charges;

    b.    Canceling and reissuing credit and debit cards;

    c.    Purchasing credit monitoring and identity theft prevention;

    d.    Monitoring their medical records for fraudulent charges and data;

    e.    Addressing their inability to withdraw funds linked to compromised accounts;

    f.    Taking trips to banks and waiting in line to obtain funds held in limited accounts;

    g.    Placing "freezes" and "alerts" with credit reporting agencies;

    h.    Spending time on the phone with or at a financial institution to dispute fraudulent charges;

    i.    Contacting financial institutions and closing or modifying financial accounts;

    j.    Resetting automatic billing and payment instructions from compromised

credit and debit cards to new ones;

k.    Paying late fees and declined payment fees imposed as a result of failed

automatic payments that were tied to compromised cards that had to be

cancelled; and

l.    Closely reviewing and monitoring bank accounts and credit reports for

unauthorized activity for years to come.

114.    In addition, Plaintiffs and Class Members also suffered a loss of value of their

Private Information when it was acquired by cyber thieves in the Data Breach. Numerous courts

have recognized the property of loss of value damages in related cases.

115.    Plaintiffs and Class Members are forced to live with the anxiety that their Private

Information —which contains the most intimate details about a person's life—may be disclosed

to the entire world, thereby subjecting them to embarrassment and depriving them of any right to

privacy whatsoever.

116.    Defendant's delay in identifying and reporting the Data Breach caused additional

harm. In a data breach, time is of the essence to reduce the imminent misuse of Private Information.

Early notification helps a victim of a Data Breach mitigate their injuries, and in the converse,

delayed notification causes more harm and increases the risk of identity theft. Here, Defendant

knew of the breach and did not timely notify all victims. They have yet to offer an explanation of

purpose for the delay. This delay violates notification requirements and increases the injuries to

Plaintiffs and Class.

## <u>CLASS ALLEGATIONS</u>

117.    Plaintiffs bring this case individually and, pursuant to Rule 23 of the Federal Rules

of Civil Procedure, on behalf of the following classes:

**Nationwide Class:** All natural persons residing in the United States whose Private Information was compromised in Defendant's Data Breach (the "Nationwide Class")

**New Jersey Subclass:** All natural persons residing in New Jersey whose Private Information was compromised in Defendant's Data Breach (the "New Jersey Subclass")

118.     The New Jersey Subclass, together with the Nationwide Class, are collectively referred to herein as the "Classes".

119.     Excluded from the Classes is Defendant, its subsidiaries and affiliates, its officers, directors and members of their immediate families and any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

120.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class prior to moving for class certification.

121.     **Numerosity.**   The classes described above are so numerous that joinder of all individual members in one action would be impracticable.  The disposition of the individual claims of the respective Class Members through this class action will benefit both the parties and this Court. The exact size of the Classes and the identities of the individual members thereof are ascertainable through Defendant's records, including but not limited to, the files implicated in the Data Breach.

122.     **Commonality.**  This action involves questions of law and fact that are common to the Class Members. Such common questions include, but are not limited to:

a.     Whether Defendant had a duty to protect the Private Information of

Plaintiffs' and Class Members;

b.      Whether Defendant had a duty to maintain the confidentiality of Plaintiffs' and Class Members' Private Information;

c.      Whether Defendant breached its obligation to maintain Plaintiffs' and the Class members' private information in confidence;

d.      Whether Defendant was negligent in collecting, storing and safeguarding Plaintiffs' and Class Members' Private Information, and breached its duties thereby;

e.      Whether Plaintiffs and Class Members are entitled to damages as a result of Defendant's wrongful conduct;

f.      Whether Plaintiffs and Class Members are entitled to restitution or disgorgement as a result of Defendant's wrongful conduct; and

g.      Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

123.    **Typicality**. Plaintiffs' claims are typical of the claims of the Class Members. The claims of the Plaintiffs and members of the Classes are based on the same legal theories and arise from the same failure by Defendant to safeguard Private Information. Plaintiffs and Class Members' information was stored by Defendant's software, each having their Private Information obtained by an unauthorized third party.

124.    **Adequacy of Representation.** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the other Class Members they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; Plaintiffs intend to prosecute this action vigorously; and Plaintiffs' counsel has adequate

financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed.  Furthermore, the interests of the Class Members will be fairly and adequately protected and represented by Plaintiffs and Plaintiffs' counsel.

125.    **Predominance.**    Common questions of law and fact predominate over any questions affecting only individual Class Members. For example, Defendant's liability and the fact of damages are common to Plaintiffs and each member of the Classes. If Defendant breached its common law and statutory duties to secure Private Information on its network server, then Plaintiffs and each Class Member suffered damages from the exposure of sensitive Private Information in the Data Breach.

126.    **Superiority.** Given the relatively low amount recoverable by each Class Member, the expenses of individual litigation are insufficient to support or justify individual suits, making this action superior to individual actions.

127.    **Manageability.** The precise size of the Classes is unknown without the disclosure of Defendant's records.  The claims of Plaintiffs and the Class Members are substantially identical as explained above. Certifying the case as a class action will centralize these substantially identical claims in a single proceeding and adjudicating these substantially identical claims at one time is the most manageable litigation method available to Plaintiffs and the Classes.

## FIRST CAUSE OF ACTION
### NEGLIGENCE AND NEGLIGENCE *PER SE*
### (On Behalf of Plaintiffs and the Nationwide Class)

128.    Plaintiffs repeat and re-allege paragraphs 1 through 127 of this Complaint and incorporates them by reference herein.

129.    Defendant owed a duty under common law to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting

their Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

130.    Defendant's duty to use reasonable care arose from several sources, including but not limited to those described below.

131.    Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By collecting and storing Private Information that is routinely targeted by criminals for unauthorized access, Defendant was obligated to act with reasonable care to protect against these foreseeable threats.

132.    Defendant's duty also arose from Defendant's position as a business and employer. Defendant holds itself out as a trusted data collector, and thereby assumes a duty to reasonably protect its contract employees' information.  Indeed, Defendant, as a direct data collector, was in a unique and superior position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

133.    Defendant breached the duties owed to Plaintiffs and Class Members and thus was negligent. Defendant breached these duties by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of contract employee information that resulted in the unauthorized access and compromise of PII; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the

time it began or within a reasonable time thereafter; and (g) failing to timely notify Plaintiffs and Class Member about the Data Breach.

134.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, their Private Information would not have been compromised.

135.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as Defendant or failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendant's duty.

136.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of a data breach involving the Private Information of its current and former contract employees.

137.    Plaintiffs and members of the Class are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

138.    Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

139.    The harm that has occurred as a result of Defendant's conduct is the type of harm that the FTC Act was intended to guard against.

140.    Defendant violated its own policies not to use or disclose PII without written authorization.

141.    Defendant violated its own policies by actively disclosing Plaintiffs' and the Class Members' PII; by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII; failing to maintain the

confidentiality of Plaintiffs' and the Class Members' records; and by failing to provide timely notice of the breach of PII to Plaintiff and the Class.

142.    As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered injuries, including:

      a.    Theft of their Private Information;

      b.    Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

      c.    Costs associated with purchasing credit monitoring and identity theft protection services;

      d.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

      e.    Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Defendant Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

      f.    The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII being placed in the hands of criminals;

      g.    Damages to and diminution in value of their Private Information entrusted,

directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiffs' and Class Members' data against theft and not allow access and misuse of their data by others;

h.    Continued risk of exposure to hackers and thieves of their Private Information, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' data;

i.    Loss of their privacy and confidentiality in their PII;

j.    The erosion of the essential and confidential relationship between Defendant – as an employer and business – and Plaintiffs and Class members as contract employees.

143.    As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Nationwide Class)**

144.    Plaintiffs repeat and re-allege paragraphs 1 through 127 of this Complaint and incorporates them by reference herein.

145.    Upon information and belief, Defendant entered into contracts with its employees, which included procedures and protocols sufficient to safeguard the Private Information that was to be entrusted to it.

146.    Such contracts were made expressly for the benefit of Plaintiffs and the Class, as it was their Private Information that Defendant agreed to receive and protect throughout

employment. Thus, the benefit of collection and protection of the Private Information belonging to Plaintiffs and the Class was the direct and primary objective of the contracting parties, and Plaintiffs and Class Members were direct and express beneficiaries of such contracts.

147.    Defendant knew that if they were to breach these contracts with its employees, Plaintiffs and the Class would be harmed.

148.    Defendant breached its contracts with its current and former contract employees and, as a result, Plaintiffs and Class Members were affected by this Data Breach when Defendant failed to use reasonable data security and/or business associate monitoring measures that could have prevented the Data Breach.

149.    As foreseen, Plaintiffs and the Class were harmed by Defendant's failure to use reasonable data security measures to securely store and protect the files in its care, including but not limited to, the continuous and substantial risk of harm through the loss of their Private Information.

150.    Accordingly, Plaintiffs and the Class are entitled to damages in an amount to be determined at trial, along with costs and attorneys' fees incurred in this action.

**THIRD CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Nationwide Class)**

151.    Plaintiffs repeat and re-allege paragraphs 1 through 127 of this Complaint and incorporates them by reference herein.

152.    Plaintiffs bring this claim in the alternative to their negligence and breach of contract claims above.

153.    Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they provided Defendant with their Private Information. In exchange, Defendant should have provided adequate data security for Plaintiffs' and Class Members'.

154.    Defendant knew that Plaintiffs and Class Members conferred a benefit on it in the form their Private Information as a necessary part of their receiving services for which Defendant was paid fees. Defendant appreciated and accepted that benefit. Defendant profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes.

155.    Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments on behalf of or for the benefits provided by Plaintiffs and Class Members.

156.    As such, a portion of the payments made for the benefit of or on behalf of Plaintiffs and Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

157.    Defendant, however, failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not provide adequate data security in return for the benefit Plaintiffs and Class Members provided.

158.    Defendant would not be able to carry out an essential function of its regular business without the Private Information of Plaintiffs and Class Members and derived revenue by using it for business purposes. Plaintiffs and Class Members expected that Defendant or anyone in Defendant's position would use a portion of that revenue to fund adequate data security practices.

159.    Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

160.    If Plaintiffs and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have allowed their Private Information to be provided to Defendant.

161.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profit at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

162.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money wrongfully obtained Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

163.    Plaintiffs and Class Members have no adequate remedy at law.

164.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the

continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

165.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

166.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them.

**FOURTH CAUSE OF ACTION**
**Violation of the New Jersey Consumer Fraud Act,**
**N.J.S.A. § 56:8-1, *et seq*.**
**(By Plaintiff Mateo Gomez and on Behalf of the New Jersey Subclass)**

167.    Plaintiff Mateo Gomez restates and realleges paragraphs 1 through 127 above as if fully set forth herein and brings this claim on behalf of himself and the New Jersey Subclass ("Plaintiff" and the "Class" for the purposes of this count).

168.    Defendant has violated N.J.S.A. § 56:8-1, et seq., by engaging in unconscionable, deceptive, or fraudulent business acts and practices and omissions regarding the same as defined in N.J.S.A. § 56:8-2 with respect to the services provided to the Class.

169.    Defendant engaged in unconscionable acts and practices with respect to the services by establishing the sub-standard security practices and procedures described herein; by soliciting and collecting the Private Information of Plaintiff and the Class with knowledge that the information would not be adequately protected; and by storing the Private Information of Plaintiff and the Class in an unsecure environment in violation of HIPAA and the rules and regulations promulgated thereunder, including 42 U.S.C. § 1301, et seq., 45 C.F.R. §§ 164.400-414, and 45

C.F.R. § 164.306, et seq. (as alleged supra.); and in violation of the Federal Trade Commission Act, 15 U.S.C. § 45 and 17 C.F.R. § 248.201, which require Defendant to employ reasonable methods of safeguarding the Private Information of Plaintiff and the Class.

170.    Further, Defendant failed to inform Plaintiff and the New Jersey Subclass that it had not undertaken sufficient measures to ensure the security of their Private Information.

171.    As a direct and proximate result of Defendant's unlawful practices and acts, Plaintiff and the Class were injured and lost money or property, including but not limited to the price received by Defendant for the services, the loss of Plaintiff's and the Class's legally protected interest in the confidentiality and privacy of their Private Information, nominal damages, and additional losses as described above.

172.    Defendant knew or should have known that its data security practices were inadequate to safeguard the Private Information of Plaintiff and the Class and that the risk of a data breach or theft was highly likely, especially given its inability to adhere to basic encryption standards and data disposal methodologies. Defendant's actions in engaging in the above-named unlawful practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Class.

173.    Plaintiff and the Class seek relief under N.J.S.A. § 56:8-2.12 and §56-8.19 including, but not limited to, restitution to Plaintiff and the Class of money or property that Defendant may have acquired by means of Defendant's unconscionable business practices, restitutionary disgorgement of all profits accruing to Defendant because of Defendant's unconscionable business practices, treble damages, declaratory relief, attorneys' fees and costs and injunctive or other equitable relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and Class Members, requests judgment against Defendant and that the Court grants the following:

A.    For an Order certifying this action as a class action and appointing Plaintiffs and their counsel to represent the Classes;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

C.    For injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

    i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii.    requiring Defendant to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii.    requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv.    requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiffs and Class Members;

v.    prohibiting Defendant from maintaining the Private Information of Plaintiffs and Class Members on a cloud-based database;

vi.    requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.    requiring Defendant to audit, test, and train their security personnel regarding any new or modified procedures; requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

ix.    requiring Defendant to conduct regular database scanning and securing checks;

x.    requiring Defendant to establish an information security training program that includes at least annual information security training for

all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xi.    requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii.    requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiii.    requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv.    requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xv.    requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvi.    for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of actual damages, compensatory damages, statutory damages, and nominal damages, in an amount to be determined, as allowable by law;

E.    For an award of punitive damages, as allowable by law;

F.    For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

G.    Pre- and post-judgment interest on any amounts awarded; and

H.    Such other and further relief as this court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

A jury trial is demanded on all claims so triable.

Dated: August 9, 2024                    Respectfully Submitted,


                                         <u>/s/ Steven Sukert</u>
                                         Steven Sukert
                                         Kenneth J. Grunfeld (*pro hac vice*)
                                         **KOPELOWITZ OSTROW P.A.**
                                         1 West Las Olas Blvd., Suite 500
                                         Fort Lauderdale, FL 33301
                                         sukert@kolawyers.com
                                         grunfeld@kolawyers.com

                                         Andrew J. Shamis
                                         Leanna A. Loginov
                                         **SHAMIS & GENTILE, P.A.**
                                         14 NE 1st Ave, Suite 705
                                         Miami, FL 33132
                                         Tel: 305-479-2299
                                         ashamis@shamisgentile.com
                                         lloginov@shamisgentile.com

                                         Joshua Jacobson (*pro hac vice*)
                                         **JACOBSON PHILLIPS PLLC**
                                         478 E Altamonte Drive, Suite 108-570
                                         Altamonte Springs, FL 32701
                                         Tel: 407-720-4057
                                         joshua@jacobsonphillips.com


                                         *Counsel for Plaintiffs and the Classes*